**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ | : | |
| ANTHONY REID, | : | |
| | : | Civil Action No. 14-5451-PD |
| Petitioner, | : | (re: Mark Lisby homicide) |
| | : | |
| v. | : | THIS IS A CAPITAL CASE |
| | : | |
| JOHN E. WETZEL, et al., | : | |
| | : | |
| Respondents. | : | |
| _____ | : | |

_____

**SECOND AMENDMENT TO PETITION**
**FOR WRIT OF HABEAS CORPUS**
_____

MATTHEW LAWRY
CRISTI CHARPENTIER
LOREN STEWART
Assistant Federal Defenders
Federal Community Defender Office
 for the Eastern District of Pennsylvania
The Curtis, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Petitioner, Anthony Reid*

Dated: November 3, 2022

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

CLAIMS FOR RELIEF .................................................................................................... 2

AMENDMENT TO CLAIM I ........................................................................................... 2

I.      PETITIONER'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED
WHEN THE COMMONWEALTH USED ITS PEREMPTORY STRIKES IN A
RACIALLY DISCRIMINATORY MANNER, AND TRIAL COUNSEL WAS
INEFFECTIVE FOR FAILING TO OBJECT. ...................................................... 2

NEW CLAIM FOR RELIEF ............................................................................................ 5

XIX.   THE COMMONWEALTH PRESENTED FALSE EVIDENCE AND SUPPRESSED
MATERIAL EXCULPATORY EVIDENCE REGARDING THE ACTUAL
SHOOTER, LAWRENCE BOSTON, IN VIOLATION OF PETITIONER'S RIGHTS
TO DUE PROCESS AND A FAIR TRIAL UNDER *BRADY V. MARYLAND* AND
*NAPUE V. ILLINOIS.* ......................................................................................... 5

    A.      Legal Standard ........................................................................................... 5

    B.      Factual Allegations .................................................................................... 7

    C.      Argument ................................................................................................. 10

    D.      The Suppressed Evidence ....................................................................... 13

    E.      The Elements of a *Brady* Violation Are Established Here. .................... 15

          1.      Favorable to the Accused – Exculpatory or Impeaching ......................... 15

          2.      Suppressed by the State ........................................................... 17

          3.      Materiality................................................................................. 17

    F.      The Commonwealth Also Violated *Napue v. Illinois.* .......................... 25

REQUEST FOR RELIEF ................................................................................................ 26

# INTRODUCTION

Petitioner Anthony Reid, by and through undersigned counsel, pursuant to <u>Federal Rule of Civil Procedure 15(a)</u>, hereby submits his Second Amendment to Petition for Writ of Habeas Corpus, and states as follows:

1.    All statements, allegations and claims for relief set forth in Mr. Reid's initial habeas petition, *see* (<u>Doc. 4</u>), and his First Amendment to Petition for Writ of Habeas Corpus ("first amendment"), *see* (<u>Doc. 43</u>), are re-alleged as if set forth fully herein.

2.    This Second Amendment includes an amendment to Claim I and raises one new claim labeled Claim XIX. The new claim alleges violations of due process under the Fourteenth Amendment and *Brady v. Maryland*, <u>373 U.S. 83</u> (1963). Mr. Reid concurrently moves for leave to amend pursuant to Rule 15(a). This is Mr. Reid's second amendment and the Commonwealth does not oppose the amendment. *See* <u>Fed. R. Civ. P. 15(a)(2)</u>. In any event, it is appropriate to grant leave to amend here because "justice so requires." <u>Fed. R. Civ. P. 15(a)(2)</u>; *see also* Mot. for Leave at 6–7.

3.    The amendment to Claim I and new Claim XIX are based on evidence that the Philadelphia District Attorney's Office disclosed to the defense for the first time on or about September 16, 2021. The evidence was in the Commonwealth's files. On July 26, 2022, within one year of discovery of the new evidence, Mr. Reid filed a successive petition for relief under Pennsylvania's Post-Conviction Relief Act (PCRA). Under <u>28 U.S.C. § 2244(d)(2)</u>, Mr. Reid is entitled to statutory tolling from the date that he sought collateral relief in the state courts. This amendment is timely.

**CLAIMS FOR RELIEF**

**AMENDMENT TO CLAIM I**

[REPLACE PARAGRAPH 24 OF THE PETITION (DOC. 4) WITH THE
FOLLOWING PARAGRAPHS:]

**I.     PETITIONER'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED
WHEN THE COMMONWEALTH USED ITS PEREMPTORY STRIKES IN A
RACIALLY DISCRIMINATORY MANNER, AND TRIAL COUNSEL WAS
INEFFECTIVE FOR FAILING TO OBJECT.**

24a.     On September 16, 2021, the Commonwealth produced the handwritten jury

selection notes of ADA King in this case, as well as jury venire and petit venire information from

its files regarding the race of the jurors who served at Petitioner's trial. As occurred in Mr.

Reid's other case,[1] ADA King systematically tracked the race of the jurors as reflected in his

notes, marking Black jurors with "N," white jurors with "W," Hispanic jurors with "H," and

Asian-American jurors with "O." ADA King used his peremptory strikes in a manner that

violated the Sixth and Fourteenth Amendments and *Batson v. Kentucky*, 476 U.S. 79 (1986).

24b.     Review of the jury selection notes, together with the trial record and the methods

used by Petitioner to make his initial proffer, reveals the following about the racial identities of

the jurors:

   i.     The petit jury consisted of six white jurors and six Black jurors. There were two

          white alternates.

   ii.    Leaving aside those jurors struck for cause or struck by the defense before the

          Commonwealth made a choice whether to accept or strike the juror, there were 39

          potential jurors available for peremptory strikes by the prosecutor. Of those 39

          people whom the prosecutor had an opportunity to strike, 21 were Black, 17 were

---

[1] Case No. 14-5452-PD (E.D. Pa.); *Commonwealth v. Reid*, CP-51-CR-0602521-1989 (the
Waters case).

white, and two are still unknown. Of that almost evenly balanced pool, the prosecutor struck 14 blacks[2] and 4 whites.[3] By contrast, the prosecutor accepted 7 Blacks,[4] 13 whites,[5] and one of unknown race.[6]

 iii. The racial identities of jurors accepted by the Commonwealth but stricken by the defense are as follows: five whites,[7] one Black,[8] and one unknown.[9]

 24c. This pattern of strikes is grossly disproportionate. For example, the prosecutor struck 66.7% of the Black jurors whom he had the chance to strike (14/21), while he struck 28.6% of the white venire presented to him (4/14). Roughly, the ADA struck blacks, given the opportunity, at 2.3 times the rate he struck whites. This "pattern" of racial disparity may establish a *prima facie* case of discrimination under *Batson*.

 24d. Moreover, additional facts about the voir dire support the *prima facie* case. Of the four white jurors whom Mr. King struck, one was hesitant to serve on a case involving drugs and mental illness, *see* NT 12/13/90 at 23-24 (Bernard Largman); one had a husband who had been charged with a crime, *see id.* at 53-55 (Violet Louridas); one was an attorney, *see* NT 12/18/90 at 34 (Maryann Monheit); and one was hesitant about the death penalty. *See id.* at 165-66 (Michael

---

[2] Sidney Gallien, Zella Barnes, Christine Turner, Delores Empson, Darlene Brown, William Starks, Ollie Taylor, Jr., Lucinda Jones, Purnell Midgett, Eileen Patton, Aaron Hamilton, Brenda Hunter, Vernon Jordan, and Esther Williams.

[3] Bernard Largman, Violet Louridas, Maryann Monheit, and Michael Horn.

[4] Gertrude Brown, Joyce Norris, Carter Stone, Mildred Haynes, Wilbur Skipworth, Beverly Murphy, and Sharon Brown.

[5] Carol Guaglione, Rosella Laidlaw, Carol Zajko, Alvin Applebaum, Samuel Long, Marie Corley, Roxanne Eckbold, Richard Dibenedetto, Sydney Twers, Mary Sheppard, Marc Joseph, Sara Paul, and Stephen Friedman.

[6] Joseph Collins.

[7] Carol Guaglione, Carol Zajko, Roxanne Eckbold, Mary Sheppard, and Marc Joseph.

[8] Joyce Norris.

[9] Joseph Collins.

Horn). This suggests that white jurors were presumptively acceptable unless they had some characteristic suggesting bias against the prosecution or the death penalty.

24e.    The reverse is also true—several Black jurors struck by Mr. King show no obvious anti-prosecution bias and appear to be neutral or pro-prosecution jurors aside from their race. *See, e.g.*, NT 12/12/90 at 128-33 (Delores Empson; married, employed for 30 years, no hesitation about death penalty); *id.* at 142-46 (Darlene Brown; cousin is a police officer, employed, perfunctory voir dire); NT 12/18/90 at 108-12 (Brenda Hunter; father-in-law is police officer, perfunctory voir dire); *id.* at 112-15 (Vernon Jordan; employed high school graduate, perfunctory voir dire); *id.* at 127-30 (Esther Williams; married and employed, perfunctory voir dire).

24f.    In addition, Mr. King's jury selection notes show that he kept track of the race of all the jurors who were questioned. The District Attorney trained prosecutors to keep track of potential jurors' races so that they would know how many Blacks and whites remain available for strikes or selection, as part of an overall strategy intended to exclude Black jurors. *See* App. at 14–87 (DATV Productions, Jury Selection with Jack McMahon, at 79–80 ("Training Tape")). Moreover, the prosecutor's notes show that he kept track of the race of each prospective juror, supporting the claim of a *Batson* violation. *See Foster v. Chatman*, 578 U.S. 488, 493-95, 513-14 (2016) (concluding, in case where "black prospective jurors were highlighted in bright green" and "[t]he letter 'B' also appeared next to each black prospective juror's name," that "the focus on race in the prosecution's file plainly demonstrates a concerted effort to keep black prospective jurors off the jury"); *see also Diggs v. Vaughn*, Civ. A. No. 90-2083, 1991 WL 46319, *1 (E.D. Pa. March 27, 1991) (because the prosecutor's notes show that he "kept careful records of the

race of each prospective juror," they suggest that race "featured very prominently in [his] thought processes," and support the claim of a *Batson* violation).

**NEW CLAIM FOR RELIEF**

[Insert after last claim in the First Amendment to Petition, Claim XVIII – (Doc. 43 at 9).]

XIX.   **THE COMMONWEALTH PRESENTED FALSE EVIDENCE AND SUPPRESSED MATERIAL EXCULPATORY EVIDENCE REGARDING THE ACTUAL SHOOTER, LAWRENCE BOSTON, IN VIOLATION OF PETITIONER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER *BRADY V. MARYLAND* AND *NAPUE V. ILLINOIS*.**

287.   All allegations and facts set forth in the Petition and this Amendment are incorporated by reference as if set forth fully herein.[10]

**A.   Legal Standard**

288.   Under *Brady*, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "A rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks*, 540 U.S. at 696. Further, the duty to disclose under Brady is absolute—it does not depend on defense counsel's actions. *Dennis*, 834 F.3d at 290 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). "The defense is 'entitled to presume that prosecutors have discharged their official duties.'" *Bracey*, 986 F.3d at 280 (quoting *Dennis*, 834 F.3d at 290, and *Banks*, 540 U.S. at 696). "[A] defendant has no burden to scavenge for hints of undisclosed *Brady* material." *Bracey*, 986 F.3d at 280.

---

[10] Mr. Reid begins Claim XIX at paragraph 287 to continue the paragraph sequence that would follow his habeas petition (ECF No. 4) (paragraphs 1–245), and the First Amendment to the Petition (ECF No. 43). The First Amendment contains paragraphs 1–41, which should have been marked paragraphs 246–286. Accordingly, this claim begins with paragraph 287.

5

289.     To prove a *Brady* violation, a defendant must show the evidence at issue meets three elements. First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985). Second, it "must have been suppressed by the State, either willfully or inadvertently." *Strickler*, 527 U.S. at 282. Third, the evidence must have been material such that prejudice resulted from its suppression. *Id.*; *see also Banks*, 540 U.S. at 691. The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . [Rather], [a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.*

290.     Under *Giglio v. United States*, 405 U.S. 150, 153 (1972), the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice." *Id.* at 153 (citation omitted). "A conviction obtained through use of false evidence, known to be such by representatives of the States, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Furthermore, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*

291.     If the prosecution presented false evidence or allowed false evidence to stand uncorrected, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Giglio*, 405 U.S. at 154 (quoting *Napue*,

360 U.S. at 271). "*Giglio* claims are subject to a more favorable standard of materiality than other *Brady* claims." *Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009).

**B.     Factual Allegations**

292.    All prior allegations are realleged as if set forth fully herein.

293.    When Mark Lisby was killed, two people were present: Mr. Reid and a man named Lawrence Boston. Lawrence Boston was a drug dealer. He supervised other drug dealers. Boston had learned that Mark Lisby had stolen drugs from one of Boston's dealers days before the murder. When Boston demanded repayment, Lisby was unable to pay. Lisby was shot three times and died immediately.

294.    Boston was arrested first, over a month after the crime. He was arrested for shooting two of Mark Lisby's family members—Terrance and Randall Lisby. When police questioned him about killing Mark Lisby and told him that they had eyewitnesses against him, Boston said that he did not kill Lisby, Mr. Reid did.

295.    The Commonwealth tried Mr. Reid for this murder twice. Mr. Reid's defense was mere presence—that he was present at the scene of the crime, but that he did not kill Mark Lisby, nor did he know that Lawrence Boston was going to kill Lisby. The Commonwealth had no physical or forensic evidence linking Mr. Reid to the crime. Its case rested on the testimony of Lawrence Boston and of a man named Morris Dozier.

296.    Dozier, a drug addict, testified in both trials that he witnessed Mr. Reid and Boston with Mark Lisby at the time of the shooting. Dozier did not identify Mr. Reid when police showed him Mr. Reid's photograph, although he knew Mr. Reid from the neighborhood. Dozier also told defense investigators that Mr. Reid was not the shooter. *See* NT 2.50-51, 58, 71-72. Dozier described the perpetrator as wearing all dark clothes, but another Commonwealth

witness, Lisa Dargan, who did not see the shooting itself, testified that Mr. Reid was wearing a white shirt moments before the shooting. NT 12/27/90 at 85; NT 2.39, 50.

297. The Commonwealth presented Lawrence Boston as a witness. At the first trial, Boston testified and identified Mr. Reid as the shooter. NT 12/5/89 at 80. Boston claimed that he did not know that Reid was going to kill Lisby. *Id.* at 82, 91. He explained that he (Boston) was questioned about the Lisby murder but was never arrested or charged. *Id.* at 83, 86, 126-27. Boston testified that he was a drug dealer, had dealt drugs for about two years, and had dealers who worked for him. *Id.* at 78, 87, 93, 103, 133. Boston acknowledged that Lisby owed Boston—not Mr. Reid—money for the drugs that Lisby stole. *Id.* at 97 ("he didn't have my money"); *id.* at 101 ("Q. [I]t wasn't his drugs, was it? A. No. Q. It was your drugs, wasn't it? A. Yes."); *id.* at 102 ("Q. [T]hat was your money and your drugs that this man had used up; is that right? A. Yes."). Boston also acknowledged that he—not Mr. Reid—did all of the talking with Lisby before Lisby was shot. *Id.* at 79, 82, 102, 105.

298. Boston also acknowledged that he had been arrested and charged for shooting Terrence Lisby and Randall Lisby and that, at the time of his testimony, he had been held for court after a preliminary hearing and was facing trial on aggravated assault charges. *Id.* at 88-89. Boston initially maintained that no one had made any promises to him with respect to those charges in exchange for his testimony in Mr. Reid's case. *Id.* at 89. But he changed his testimony on cross-examination: he then acknowledged that ADA Roger King had made a promise to his lawyer that King would "make known [Boston's] cooperation to the Judge" if Boston were convicted of shooting Randall and Terrence Lisby. *Id.* at 122-24. On re-direct, Boston changed his testimony again and said there had been no promises. *Id.* at 162. Boston was not questioned on whether he would face charges for the murder of Mark Lisby.

8

299.    At the conclusion of the first trial, the jury found Mr. Reid guilty of conspiracy, but the jury was deadlocked on all other charges, and a mistrial was declared as to those charges.

300.    At the second trial, Boston invoked his Fifth Amendment right against self incrimination and refused to testify. Assistant District Attorney (ADA) Roger King urged the trial court to declare Boston "unavailable" and allow the admission of Boston's prior testimony from the first trial. ADA King insinuated that Boston was facing unspecified prosecution, that there were "ongoing situations" that he could not discuss, and that 'it' was "not over" with respect to Boston. Based on ADA King's arguments, the trial court agreed that Boston was in legal peril, permitted him to invoke the Fifth Amendment, and allowed his prior testimony to be read to the jury in its entirety at the second trial. There was no cross-examination of Boston at the second trial.

301.    At the end of the second trial, the jury returned verdicts of guilty on all of the remaining charges, including murder. After a short penalty phase, the jury sentenced Mr. Reid to death.

302.    Over thirty years after Mr. Reid's trial, on September 16, 2021 the Commonwealth produced to counsel for Mr. Reid over 3,400 pages of discovery. In the discovery was evidence that Lawrence Boston had come to the District Attorney's Office between the two trials and had a secret meeting with ADA Roger King, Detective Paul Raley, and others. Specifically, there was a handwritten memorandum, *see* Supplemental Appendix ("Supp. App.") at 1, listing the names of the people present and the issues discussed. The memorandum reveals that Boston was cooperating with the prosecution, not that he was in danger of being charged. Before September 16, 2021, the Commonwealth had never produced the memorandum to Mr. Reid or his counsel.

303.     Another handwritten document that was suppressed is an undated, unsigned document that says, "Roger, Mr. Boston is in your office." *Id.* at 2. This document suggests that Boston was allowed in ADA King's office when King was not there. It implies a level of trust between King and Boston that belies the idea that Boston was going to be prosecuted. This document also had never been previously produced.

**C.     Argument**

304.     The Commonwealth suppressed this evidence that showed the relationship it had developed with Lawrence Boston. Boston was cooperating with the Commonwealth, Boston was biased against Mr. Reid, and Mr. Reid was prevented from confronting and cross-examining Boston on his bias. The jury did not hear that Boston had secretly met with the Commonwealth or that he spent time in Roger King's office.

305.     Lawrence Boston had motive to kill Mark Lisby. Lisby had stolen Boston's drugs. NT 12/5/89 at 97, 101, 102. Lisby had been unable to pay him back. *Id.* at 97. On the night of the murder, Boston went to Lisby's house to talk to him. Boston did all the talking with Lisby. *Id.* at 79, 82, 102, 105.

306.     Likewise, Lawrence Boston had the motive to falsely implicate someone other than himself in the Mark Lisby murder. Detectives were interrogating him about another shooting in addition to this one. On August 17, 1988, two of Mark Lisby's family members, Terrance and Randall Lisby, were shot but survived. On August 26, 1988, Lawrence Boston and a man named Frank Bynum were arrested and charged with shooting them. NT 12/5/89 at 88-89; *see also* App. at 114 (Criminal Extract of Lawrence Boston reflecting arrest date). It was the next day, August 27, 1988, while Boston was still being held at the Round House for that non-fatal shooting, that detectives brought him up to the Homicide Division to interrogate him about the Mark Lisby murder. NT 12/5/89 at 128-29. Boston initially denied knowing anything about the

10

Mark Lisby murder. App. at 107-10 (first half of Boston police statement). When police told him that they had "eyewitness testimony against him," Boston then told police that he had been present, but that Mr. Reid shot and killed Mark Lisby. App. at 110-13 (second half).

307.     On August 31, 1988, according to his arrest report, "Anthony Reid . . . [was] arrested when he walked into [the] P[olice] A[dministration] B[uilding] 7:50 AM 8/31/88 and asked to see Detectives to find out why they wanted to talk to him." App. at 116 (Arrest Report).

308.     The timeline was thus:

| | |
|---|---|
| July 12, 1988, 2:07 am: | Mark Lisby murder |
| Aug. 17, 1988: | Boston/Bynum shoot Terrance and Randall Lisby |
| Aug. 26, 1988: | Boston arrested for conspiracy (w/Bynum) to shoot Terrance and Randall Lisby. |
| Aug. 27, 1988: | Lawrence Boston gives the police a statement |
| Aug. 31, 1988: | Anthony Reid came into the PAB to ask detectives why they wanted to talk to him and was arrested. |

Lawrence Boston was not only implicated in killing Mark Lisby; at the same time, he was facing charges including aggravated assault and conspiracy regarding the shooting of Terrance and Randall Lisby.

309.     Lawrence Boston was not charged with any crime relating to the shooting of Mark Lisby in spite of the evidence against him. Boston was not charged with a crime in relation to his admitted drug dealing for two years, NT 12/5/89 at 93, 103, 134, even though he acknowledged that he was at least a mid-level drug dealer with people selling drugs for him, *id.* at 78. Even the trial court was surprised that Boston was not charged. *See* NT 1/4/91 at 4.11 (while discussing the murder charge, the Court states, "I don't even know why they didn't prosecute him.").

11

310.    At the time of the first trial, Boston was represented by attorney Mike Wallace. NT 12/5/89 at 147. After Boston's testimony at the first trial, the jury found Mr. Reid guilty of conspiracy and could not reach a verdict on the remaining charges. NT 12/9/89 at 16-17.

311.    The Commonwealth re-tried Mr. Reid in December 1990 and January 1991 on the remaining charges, including first degree murder. Mr. Reid was represented by court appointed attorney Samuel Stretton. In his opening statement, Attorney Stretton made clear that his trial strategy was to show that Lawrence Boston—not Mr. Reid—killed Mark Lisby. NT 12/27/90 at 1.31-32 ("[Y]ou will . . . reach your own conclusion as to who was the person who shot and killed Mark Lisby. . . . [Y]ou are going to hear that person from the witness stand; and his name, the defense contends, is Lawrence Boston. Lawrence Boston."); *see also* NT 1/4/91 at 4.10 (sidebar conference) ("That is what I am arguing to the Jury: My client was there, didn't do it, had no part in doing it, and Mr. Boston is the murderer.").

312.    On January 4, 1991, Attorney Stretton, ADA King, and attorney Nino Tinari had an on-the-record conference in the robing room. Mr. Tinari represented Boston. NT 1/4/91 at 4.3. ADA King represented that Attorney Tinari had requested that the Commonwealth grant immunity to Boston and that the Commonwealth would not. *Id.* ADA King indicated that Tinari believed that, by testifying, Boston would expose himself to possible criminal prosecution and that Tinari advised Boston to "avail himself of the Fifth Amendment." *Id.* at 4.4. ADA King then indicated that, if Boston invoked, he would be unavailable, and that his prior sworn testimony would be admissible. *Id.*

313.    Mr. Reid's counsel, Attorney Stretton, argued that Boston could not invoke because he had waived his privilege by previously testifying. *Id.* Attorney Stretton had not been notified ahead of time that Boston intended to invoke. *Id.* at 4.6. Defense counsel fought the

invocation, stating, "obviously I want to cross examine him . . . . I don't think this man is unavailable and I want a shot at him. And I mean I think I could approach it in a different fashion than Mr. Seay" (who had cross-examined Boston in the first trial). *Id.* at 4.22.

314.     After the trial court expressed surprise that Boston had not been charged in the Lisby murder, *id.* at 4.11, ADA King claimed that there were "still ongoing situations that I am not at liberty to discuss," and that "this is not over" with respect to Boston, *id.* Boston's attorney claimed that further cross-examination could further implicate Boston. *Id.* at 4.13. Boston invoked his Fifth Amendment right outside of the presence of the jury. *Id.* at 4.37-40. Mr. Stretton was prevented from cross-examining Boston and the jury did not get to see him testify. Instead, his entire testimony from the first trial was read verbatim to the jury. *See* NT 1/4/91 at 4.48-120. Mr. Reid was convicted and sentenced to death.

### D.     The Suppressed Evidence

315.     The Commonwealth produced pretrial discovery in this case on October 24, 1988. It was sent with a cover letter to Mr. Reid's initial lawyer, attorney Harry Seay. *See* App. at 3. That letter sets out the items that were produced in discovery in this matter. Mr. Reid alleges on information and belief that no further discovery regarding Lawrence Boston was passed at any time after the first trial until the Commonwealth produced evidence to undersigned counsel on September 16, 2021. *See supra* Section C (Jurisdiction and Timeliness).

316.     The Commonwealth suppressed two pieces of material exculpatory evidence that go to Lawrence Boston's credibility, that reflect the relationship which he had with the Philadelphia District Attorney's Office and ADA Roger King, and that should have been disclosed to the defense so that counsel could have cross-examined Boston on them.

317.     The first item is a hand-written memorandum dated January 24, 1990, 3:00 PM. App. at 1. This was after the first Lisby trial, before the second trial. The memorandum

documents a meeting in the "Interview Room" at the "D.A.'s Office." *Id.* It lists a series of names of individuals present, not all of which are legible. Among those present are: "Roger King, Mike Wallace, Lawrence Boston, [and] Paul Raley." *Id.* Mr. Reid alleges on information and belief that Mike Wallace is attorney Mike Wallace, who represented Lawrence Boston at the time. *See* NT 12/5/89 at 147. Mr. Reid alleges on information and belief that Paul Raley is Philadelphia Police Detective Paul Raley who was involved in prosecuting Mr. Reid's cases. There can be little dispute that Roger King is ADA Roger King, and that Lawrence Boston is the same man who testified in the first Lisby trial. The memorandum documents that Boston was questioned regarding his knowledge of Mr. Reid's involvement in the killing of Michael Waters.[11] *See Commonwealth v. Anthony Reid*, CP-51-CR-0602521-1989. Specifically, Boston was questioned about his knowledge of a "subject [Ford] LTD + Reid driving same" and about "if he ever saw Reid with black "International" jacket." App. at 1. Boston provided information to the police, including that he claimed he had "seen Reid with a similar jacket on several occasions in 1988 + 1989," and "that Reid was operating a Ford at one time + received tickets." *Id.*

---

[11] Mr. Reid was tried twice in the Waters killing. He was first tried in February 1990 and the jury could not reach a verdict. He was re-tried in August 1990 and was convicted and sentenced to death.

14

318.    The second item is a handwritten note that reads as follows:



App. at 2. The note is not dated. Also written on the lower portion of the page is the statement, "What more is to it." *Id.* Mr. Reid alleges that "Roger" refers to ADA Roger King, and that "Mr. Boston" refers to Lawrence Boston.

319.    Both the meeting memorandum and the note to Roger King were found in the Commonwealth's trial files and were first disclosed to Mr. Reid through undersigned counsel on September 16, 2021.

**E.    The Elements of a *Brady* Violation Are Established Here.**

**1.    Favorable to the Accused – Exculpatory or Impeaching**

320.    First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler*, <u>527 U.S. at 281-82</u>; *see also Bagley*, <u>473 U.S. at 676</u>.

321.    The suppressed evidence would have been favorable to Mr. Reid. The meeting memorandum would have shown that Boston had a close relationship with the District Attorney's Office—and ADA King—around the time of his testimony. That Boston would meet jointly with prosecutors, detectives, and his attorney suggests that he was attempting to give

information in exchange for lenience in his own cases. Boston was meeting with ADA King and detectives even *after* he testified in the first Lisby trial and they questioned him about another homicide—the Waters case. This suggests that Boston was deeply indebted to the Commonwealth; his testimony in one murder trial was not enough. At bottom, the memorandum would have had impeachment value and therefore was favorable to Mr. Reid.

322.    The note to Roger King supports the inference that Boston was at the D.A.'s Office on yet a different occasion. That is because the meeting memorandum reflects that the meeting took place in the "Interview Room," whereas the note above to ADA Roger King puts Boston in King's own office. The note suggests that ADA King and Boston had a relationship of trust. That is, if someone wrote a note to ADA King stating, "Roger, Mr. Boston is in your office," the logical inference is that ADA King was not in his office. Boston had been shown into ADA King's office even when King was not there. It is possible that Boston was permitted in King's office by himself to await ADA King. Each of these inferences shows a level of familiarity that implies a close relationship. The evidence of this relationship contradicted ADA King's statements at the second Lisby trial that there were "still ongoing situations that I am not at liberty to discuss," and that "this is not over" with respect to Boston. NT 1/4/91 at 4.11.

323.    The evidence is favorable to Mr. Reid on multiple levels. First, it suggests that ADA King's argument as to why Boston should be permitted to invoke his Fifth Amendment privilege was false. Boston should have been required to testify and been subjected to cross-examination on his relationship with the D.A.'s Office, which would go to the credibility of his testimony. Second, it shows Boston's pro-prosecution bias, including multiple undisclosed meetings with the prosecution. Third, the documents reflect that the D.A.'s Office was

16

concealing the extent of its dealings with Boston, which Mr. Reid could have used to argue that the integrity of the entire investigation was undermined.

324.    As a result of its suppression of this evidence, the Commonwealth prevented the defense from investigating the evidence, was able to make false arguments regarding Boston's danger of self-incrimination, and prevented Mr. Reid from fully cross-examining Boston, who was a key eyewitness.

325.    The suppressed evidence was favorable to Mr. Reid. The first prong of a *Brady* violation is satisfied.

### 2.    Suppressed by the State

326.    Second, it "must have been suppressed by the State, either willfully or inadvertently." *Strickler*, 527 U.S. at 282.

327.    The Commonwealth produced discovery the Mr. Reid's first attorney, Harry Seay. *See* App. at 3. As indicated on the discovery letter, the Commonwealth did not produce the Boston meeting memorandum or the Roger King note. *See id.* There is no evidence in the record to support that any other evidence was disclosed regarding Lawrence Boston. The evidence was found in the Commonwealth's files and was produced to undersigned counsel on September 16, 2021. The Commonwealth suppressed this evidence.

328.    The second prong of a *Brady* violation is satisfied.

### 3.    Materiality

329.    Third, the evidence must have been material, such that prejudice resulted from its suppression. *Strickler*, 527 U.S. at 282; *see also Banks*, 540 U.S. at 691. The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434. Materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . . [Rather, a] 'reasonable

probability' of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* Mr. Reid meets the *Brady* materiality standard.

330.     The suppressed evidence would have been a valuable tool for Mr. Reid's counsel to impeach Lawrence Boston. As noted above, the suppression of evidence that is solely of impeachment value can constitute a *Brady* violation. *See Strickler*, 527 U.S. at 281-82 ("either because it is exculpatory, or because it is impeaching"); *Bagley*, 473 U.S. at 676; *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) ("While the *Brady* decision itself concerned the failure of the prosecutor to disclose exculpatory evidence, it is clear that the rule announced in Brady applies with equal force to the prosecutor's failure to disclose evidence which could have been used for impeachment purposes."). As the Third Circuit explained in *Wilson*, "The rationale for this is clear: 'Such evidence is "evidence favorable to an accused," so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.' *Bagley*, 473 U.S. at 676 (quoting *Brady*, 373 U.S. at 87)." *Wilson*, 589 F.3d at 659. The Pennsylvania Supreme Court has adopted the same approach. *See Commonwealth v. (Roderick) Johnson*, 174 A.3d 1050, 1056 (Pa. 2017) ("The Commonwealth violates Brady by failing to disclose exculpatory evidence as well as evidence that may be used to impeach a prosecution witness.").

331.     The evidence regarding the relationship between ADA King and Boston would also have been useful to prove pro-prosecution bias. Pro-prosecution bias is powerful evidence that defense counsel should have been permitted to explore, and that the jury should have heard. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Witnesses may be impeached or discredited using evidence in the case or based on certain prior convictions. *Id.*

Another approach is "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* "The partiality of a witness is subject to exploration at trial," *id.*, and the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination, *Greene v. McElroy*, 360 U.S. 474, 496 (1959). *See also Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (noting importance of cross examination to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of a witness") (internal quotation omitted); *United States v. Abel*, 469 U.S. 45, 52 (1984) ("Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

332.     Defense counsel would have cross-examined Boston on his apparently multiple visits to the District Attorney's Office. Counsel could have brought out that Boston was permitted in ADA Roger King's office when King himself was not there—and maybe even that Boston was alone in King's office. Counsel could have implied that there was a level of trust between Boston and the D.A.'s Office, and with ADA Roger King in particular. Counsel could have brought out that the truth was that Lawrence Boston was not in any danger of being charged because he was providing ADA King with precisely the testimony that King needed against Mr. Reid. Between his open shooting case regarding Randall and Terrance Lisby and Boston's involvement in killing Mark Lisby, counsel could have shown that Boston was deeply indebted

to the Commonwealth, was a biased witness, and that his testimony could not be accepted as credible.

333.    It was critical to Mr. Reid's defense to impeach Boston and demonstrate that he was likely the person who killed Mark Lisby. Attorney Seay tried to impeach Boston in the first trial. Attorney Stretton wanted to further impeach Boston in the second trial, and he would have been able to do so but the Commonwealth's suppression of evidence of the relationship that Boston had with ADA King and the D.A.'s Office.

334.    The Commonwealth was able to introduce Boston's prior testimony without violating Mr. Reid's Sixth Amendment confrontation rights on the theory that it was prior testimony taken under oath and that the defendant had counsel and a full opportunity to cross-examine that witness at the prior proceeding. *See, e.g.*, *Commonwealth v. Rodgers*, 372 A.2d 771, 779 (1977). If a witness "invokes his or her fifth Amendment privilege," that witness "is deemed 'unavailable' for the purpose of testifying" if the invocation is legitimate. *See Commonwealth v. Bazemore*, 614 A.2d 684, 685 (Pa. 1992). The Pennsylvania Supreme Court addressed "what suffices to establish 'full opportunity' to cross-examine in the context of an unavailable witness where the Commonwealth has failed to disclose relevant impeachment evidence prior to the initial testimony" in *Bazemore*. *Id.* at 686. The Court held that, where counsel was unaware of impeachment evidence (including, but not limited to, a prior inconsistent statement, possible pending charges, a criminal record). *Id.* at 686–87. The Court noted that, if the initial "testimony could not be used at [the second] trial, appellant would be forever denied the opportunity to confront [the witness] with" the impeachment evidence. *Id.* at 687.

335.    Applying *Bazemore* to this case, the cross-examination of Boston from the first trial was not tantamount to a "full and fair opportunity" to cross examine him at the second trial.

Had the Commonwealth disclosed the *Brady* material set forth in this claim, trial counsel could have successfully argued that Boston's testimony from the first trial should not have been admitted at the second trial because Mr. Reid had no opportunity to confront him regarding his relationship with the Commonwealth. Mr. Reid should have been permitted to "test the veracity of this witness" before the jury but was denied that opportunity. *See also infra* Section F.

336.    Simply because a witness has already been impeached during cross examination does not mean that the suppression of additional impeachment evidence is not "material" for *Brady* purposes. In *Dennis*, the Third Circuit considered whether the government's suppression of additional impeachment material with respect to one witness was material where that witness had been otherwise impeached at trial. *See Dennis*, 834 F.3d at 301. The Circuit noted that, in *Banks v. Dretke*, 540 U.S. 668 (2004), the "Supreme Court rejected the state's argument that because the witness was heavily impeached, further impeachment evidence was immaterial." *Dennis*, 834 F.3d at 300 (citing *Banks*, 540 U.S. at 702); *see also Lambert v. Beard*, 633 F.3d 126, 134 (3d Cir. 2011) ("[I]t is patently unreasonable to presume—without explanation—that whenever a witness is impeached in one manner, any other impeachment becomes immaterial"), *vacated on other grounds sub nom Wetzel v. Lambert*, 565 U.S. 520 (2012). A document or report prepared by the Commonwealth and suppressed may be qualitatively different—and material—even when defense counsel attempts to impeach the witness on the same issue without an official document. *See Slutzker v. Johnson*, 393 F.3d 373, 387 (3d Cir. 2004). In *Dennis*, the Third Circuit found that the Commonwealth's suppression of a piece of evidence from the police homicide file—an activity sheet—prevented full cross examination, undermined confidence in the outcome of the trial, and warranted relief. *Dennis*, 834 F.3d at 301 (finding suppression material where impeachment document would have "[d]iscredit[ed] the prosecution's central

21

witness"). Lawrence Boston was undoubtedly a "central witness" against Mr. Reid and his credibility was crucial to the prosecution.

337.    Mr. Reid also could have utilized the suppressed evidence to impeach the quality of the Commonwealth's investigation. The identification of the shooter in this case was hotly contested and no physical or forensic evidence linked Mr. Reid to the shooting. The first jury could not reach a verdict on the murder charge. Had Mr. Reid been provided with the suppressed evidence, he could have attacked the quality of the investigation. Mr. Reid would have shown that Lawrence Boston was deeply biased and beholden to the Commonwealth. Mr. Reid would have been able to show that the Commonwealth was desperate to convict Mr. Reid—even if it had no evidence but for a witness who would identify Mr. Reid to save himself. Mr. Reid would have been able to "attack[] the reliability of the investigation." *See Kyles*, 514 U.S. at 446; *see also Lindsay v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial because withheld *Brady* evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case").

338.    The materiality of this *Brady* violation is even more clear when considered together with the exculpatory evidence that was not presented at trial as a result of trial counsel's ineffectiveness.[12] Trial counsel did not investigate, seek out or interview any such witnesses, including Darryl "Bub" Gray, Kevin Bowman, and Willie Brown.

339.    In his police statement, witness Morris Dozier told police that he had seen "Bub" while Dozier was outside sitting on his step. When Gray was interviewed by undersigned

---

[12] Mr. Reid raised a claim of ineffective assistance of trial counsel for failing to investigate evidence of his innocence in his initial PCRA. The Pennsylvania Supreme Court rejected the claim. Mr. Reid cites the evidence of innocence here so that this Court may consider *Brady* materiality under "the totality of the circumstances," as the Third Circuit has directed. *See Gov't of Virgin Islands v. Martinez*, 780 F.2d 302, 306 (3d Cir. 1985) (citing *Bagley*, 473 U.S. at 683).

counsel, he relayed that he witnessed the murder; that he saw Lisby, Mr. Reid, and a third man whom he did not recognize talking near the corner of 31st Street and Cumberland; that the third man shot Mark, while Mr. Reid "didn't do anything"; and that Morris "Backer" Dozier came out of his house at the corner of Napa and Cumberland Streets after the shooting and asked Gray what had happened. App. at 4. He added that "[t]here is no way Backer could have seen the shooting from where he was." *Id.*

340.    Kevin Bowman was mentioned in a police statement given by Terrance Lisby. Terrance Lisby told police that he sold drugs for Boston, and that Boston worked for a man named Kevin Brown, who was part of the JBM. When interviewed about this shooting, Bowman attested that (a) before the shooting he talked to Boston about the problems Boston was having with Mark Lisby; (b) after the shooting Boston told Bowman that he (Boston) had brought a gun, that Mr. Reid did not know he had the gun, and that Boston had shot Lisby when Lisby got angry; and (c) Dozier told Bowman that Dozier did not actually witness the shooting. App. at 7.

341.    Like Darryl Gray, Willie Brown told undersigned counsel that he "was standing in an alley near the scene where Mark Lisby was shot and saw the shooting take place." App. at 6. Brown grew up in the neighborhood and knew both Mr. Reid and Boston. *Id.* Brown stated, "I know Anthony Reid very well. Anthony Reid was definitely not the shooter." *Id.* Brown said that he also knew Morris Dozier (who he knew as "Backer"). *Id.* Brown averred that he "was not there or anywhere in sight when Mark Lisby was shot." *Id.*

342.    Although several witnesses have indicated that Morris Dozier did not see the shooting, he gave a statement to police and testified at both trials that he saw Mr. Reid shoot Lisby. There are at least three additional reasons that Dozier's testimony in this case does not undermine a finding of *Brady* materiality here.

23

343.     First, Dozier told police that the person who shot Lisby was wearing dark clothes. NT 12/5/89 at 35-36 (first trial); NT 1/2/91 at 2.39-40 (second trial). But Mark Lisby's girlfriend, Lisa Dargan—who knew Mr. Reid from the neighborhood and saw him just before the shooting—testified that Mr. Reid was wearing a white shirt that night. NT 12/27/90 at 1.85. Lawrence Boston was wearing "a blue shirt with . . . red writing on it and blue shorts." *Id.*

344.     Second, Dozier acknowledged that he had been drinking that night and was on his way to get more to drink. NT 12/5/89 at 32. He also acknowledged that he was high. *Id.* at 33.

345.     Third, in Dozier's account, the men walked to the corner of 31st and Cumberland, talked for about five minutes, and then the shooting occurred. NT 12/5/89 at 45. But, according to Lisa Dargan, it did not happen that way. Lisby left her home and went around the corner. She "went back and sat on the steps." NT 12/27/90 at 1.99. Then, after three or four minutes, she could see that "Mark was coming back." *Id.* Lisby would be a block away from where Dozier claimed he was. Then, Dargan continued, "I heard one of the guys say, 'Come here.' And Mark went back around the corner and I heard three gunshots." *Id.* at 1.100.

346.     Dozier's testimony is replete with inconsistencies. Investigation conducted since the trial of this case suggests that he did not witness the murder and that his trial testimony was false. In light of the credibility problems with Dozier's testimony, it is reasonably likely that, had the Commonwealth not suppressed the recently disclosed evidence, the outcome of the trial would have been different.

347.     <u>Conclusion</u>: Mr. Reid need not prove by a preponderance of the evidence that disclosure of the evidence would have resulted in an acquittal; he need only prove a reasonable probability of a different result. *Kyles*, <u>514 U.S. at 434</u>. The foregoing flaws in Mr. Reid's capital

trial undermine confidence in the verdict. *Id.* The Commonwealth violated *Brady* and the Court
should order a new trial.

       **F.**    **The Commonwealth Also Violated *Napue v. Illinois*.**

    348.    As described above, ADA King argued to the trial court that Lawrence Boston
should be permitted to invoke his Fifth Amendment right against self-incrimination because
there were "still ongoing situations that I am not at liberty to discuss," and that "this is not over"
with respect to Boston. NT 1/4/91 at 4.11. Mr. Reid alleges based on information and belief that
ADA King's representations were false. ADA King had convened an undisclosed meeting with
Boston at the D.A.'s Office in January of 1990 and had a relationship with Boston such that
Boston would be allowed in Mr. King's office without Mr. King even being present. *See* App. at
2 ("Roger, Mr. Boston is in your office"). Mr. Reid alleges on information and belief that ADA
King knowingly provided false argument to the trial court to induce the court to rule that Boston
could invoke his Fifth Amendment right against self-incrimination. In so doing, ADA King
prevented Boston from being cross examined at the second trial on promises made to him by the
D.A.'s Office in exchange for his testimony and the additional information he provided in his
meetings with police and prosecutors. Had Boston been required to testify and submit to cross
examination, his prosecution bias would have been exposed. When the jury learned of Boston's
cozy relationship with ADA King, it would have not only discredited Boston's testimony, but it
would have placed substantially less weight on the integrity of the Commonwealth's
investigation.

    349.    ADA King's false description of the prosecution's relationship with Boston
violated *Giglio* and *Napue*. Such a "deliberate deception of a court and jurors by the presentation
of known false evidence is incompatible with the rudimentary demands of justice." *Giglio*, 405

U.S. at 153. The Fourteenth Amendment does not tolerate a "conviction obtained through use of false evidence." *Napue*, 360 U.S. at 269.

350.    This particular deception satisfies the materiality standard under *Giglio* and *Napue*. "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). Here, that standard has been met. Mr. Reid requests that the Court grant a new trial. In the alternative, Mr. Reid requests that the Court grant an evidentiary hearing on this claim.

**REQUEST FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that the Court:

A.  Order Respondents to answer/respond to the claims raised in the petition and herein, after Petitioner has filed his memorandum of law;

B.  Allow discovery as may be necessary;

C.  Allow Petitioner to reply to the Commonwealth's response/answer;

D.  Allow leave to amend or supplement as may be necessary;

E.  Allow conferences with counsel, oral arguments and hearings, as necessary to resolution of this case, including evidentiary hearings;

F.  Grant all relief appropriate under rules and case law, including all equitable relief.

G.  Vacate Petitioner's convictions and sentences.

Respectfully Submitted,

/s/ Loren Stewart
LOREN STEWART
MATTHEW LAWRY
Federal Community Defender Office
  for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
The Curtis Center, Suite 545 W
Philadelphia, Pennsylvania 19106
(215) 928-0520

Dated: November 3, 2022          Counsel for Petitioner, Anthony Reid